## Case No. 16,776.

### UNITED STATES v. WRIGHT.

[1 N. J. Law J. 4.]

District Court, D. New Jersey. Nov. 18, 1877.

POSTMASTER'S BOND—DISCHARGE OF SURETIES—FORBEARANCE OF GOVERNMENT.

1. Mere indulgence or forbearance on the part of the United States government toward a postmaster, whose accounts are confused, and who is in default to the government, for an indefinite time, in the absence of fraud, will not discharge his sureties from their obligations on his bond.

2. Although, in such case, there is laches on the part of the government in disclosing the defalcations of a postmaster, or in his continuance in office after the discovery of his unfaithfulness, his sureties will not be released on account of his subsequent misconduct.

3. The possession of the office of the postmaster by a special agent of the department for one day, while adjusting the accounts, does not release the sureties from all subsequent liability under section 3836 of the Revised Statutes. That section applies only to cases where the office is vacant.

An action of debt upon a postmaster's bond to recover from the sureties the amount due the government upon the defalcation of the principal. Parties waived a jury and submitted a statement of facts, upon which the court was to find a verdict for the plaintiff or defendants according to the law in the case. The facts agreed to were substantially and in brief these: Mr. Wright was appointed postmaster of Princeton March, 1870, and duly executed an official bond, with Messrs. Duryea, Cumming, Jewell and Bailey as sureties, upon which bond this suit is brought; that before July, 1872, Wright's accounts became confused, and the post-office department found, on investigation, that he was $400 in arrears; that this sum Wright made good; that about July, 1872, he was found again to be in arrears more than before, and again he settled it; that in November, 1872, he was $800 in arrears again; that then he claimed to have been robbed in Philadelphia, but made up the deficiency; that in January, 1873, another postmaster was appointed, but Wright continued to hold his position until

March, 1873; that in settling Wright's accounts during the period between his appointment and the termination of his office, he was found a defaulter in $1100, for which deficiency this suit is brought. The sureties had not been notified of these previous defalcations nor of the several investigations of the post-office department.

A. Q. Keasbey, for plaintiff.
E. T. Green, for defendant.

NIXON, District Judge. 1. The first ground taken by the counsel of the defendants to bar the right of recovery is that the extension of time for paying over moneys due and owing to the United States, granted to the postmaster by the special agent and without notice to the sureties, discharges them. It is a sufficient reply to this to say that the statement of facts agreed upon by the parties furnishes no support to the proposition that any extension of time for payment was granted. On the contrary, there seems to have been a commendable vigilance on the part of the government officers in investigating the accounts of the principal, and in compelling him to pay promptly all sums due to the department. There was neither indulgence nor forbearance; although, if there had been, it will hardly be contended that mere indulgence or forbearance for an indefinite time, in the absence of fraud, would have discharged the sureties from their contract. Locke v. Postmaster General [Case No. 8,441]; U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 720; U. S. v. Van Zandt, 11 Wheat. [24 U. S.] 184; U. S. v. Simpson, 3 Pen. & W. 437; Railroad Co. v. Schaeffer, 8 Am. Law J. 110.

2. The second ground is that the act of the United States in continuing Wright in office after he was known to the officers of the government to be a defaulter was a fraud upon the rights of the sureties and discharged them from all liability. This ground assumes that it was the right of the sureties to be notified by the government as soon as any confusion or difficulties arose in regard to the accounts of the principal, and that a failure to give such notice relieves the sureties from any continuing liability. In other words, it is an attempt to avoid contracts of guaranty on account of the existence of facts happening after the contract was executed, which would have rendered the contract void if they had existed at the time it was made.

It is a settled principle that a party taking a guaranty from a surety must not allow him to enter the contract under false impressions. If he knows anything in regard to the situation or character of the principal which increases the risk of the surety, and withholds his knowledge, it is a fraud which releases the grantor. Thus, a person has a clerk in his employ, whom he discovers to be dishonest; concealing the fact of the dishonesty, he demands security, and the person interested

in the clerk and ignorant of his unfaithfulness, enters upon his bond for the faithful discharge of his duties. Such suretyship, under the circumstances, is void; because the grantor had the right to infer from the silence of the employer that he regarded the clerk as a trustworthy person (Smith v. Bank of Scotland, 1 Dow, 272; Railton v. Mathews, 10 Clark & F. 934; and Insurance Co. v. Lloyd, 10 Exch. 532); although in the last-quoted case the principle was qualified by Pollock, C. B., by holding that in cases of guaranty the concealment, in order to vitiate the contract, must be fraudulent. But this is the doctrine in equity. Whether such a defence is available at law in a suit upon a bond remains an open question. In Everett v. Stone [Case No. 4,577], Judge Story was inclined to doubt its availability as a legal defence. And the supreme court in Etting v. Bank of U. S., 11 Wheat. [24 U. S.] 59, seems to have been equally divided upon the question. In that case the bank brought an action of assumpsit against Etting, as the endorser of a promissory note of one McCullough under the following circumstances: The president of the branch bank at Baltimore. McCullough, who was the cashier, and one Williams, one of the directors of the bank, became indebted to the bank in the sum of $3,497,700. Various conferences were held between the parties and the directors in regard to securing the debt. Terms of arrangement were finally agreed on, involving, amongst other things, the separate liability of each of the debtors for $300,000 instead of the joint liability of all for $900,000, and for which additional security was to be procured by each of the parties. A portion of the security offered by McCullough and accepted by the bank were sixteen merchants of Baltimore, who became bound as endorsers for $12,500 each, of whom Etting was one. The negotiations for the completion of the business were some time in progress, and were concluded on the 17th of May, 1819, and on the 18th of May McCullough was removed from the office of cashier, which he had held from the first establishment of the bank. When the note endorsed by Etting fell due, it was protested for nonpayment. Suit was brought by the bank, and the defence was made that the maker was a defaulter at the time the note was given; that his indebtedness to the bank was the result of his unauthorized and fraudulent appropriations of their funds to his own use; that the fact was known to the bank, but was not revealed to the surety when he became the endorser of the note; and that such concealment and the immediate removal of the cashier was a fraud upon the endorser, and released him from liability. On the trial in the court below the judge charged the jury "that in order to vitiate the note and endorsement in law and to bar the plaintiffs' right to recover thereon on the ground of a fraudulent misrepresentation, or fraudulent concealment of

circumstances known to them, and unknown to the defendant, it was incumbent on the defendant to show that he applied to the plaintiffs for information, or held some communication with them for the purpose of receiving such information, and that on such application or communication the plaintiffs either misrepresented or concealed such circumstances; and that, in the absence of such proof, there was nothing in the facts given in evidence by the defendant to effect the right of recovery in the action." Judgment was rendered for the plaintiff and the cause was removed into the supreme court by writ of error. It was elaborately argued by the ablest lawyers—Mr. Webster and Mr. Taney for the plaintiffs in error, and the attorney general (Wirt) and Mr. Emmett for the defendants. Commenting upon the instructions given by the judge of the circuit court, the counsel for the plaintiffs in error maintained with consummate ability that the act of the defendants in error of continuing the cashier in office after his misappropriation of the funds was discovered in order to give him credit and thereby to procure the security in question, by which means the plaintiff in error was deceived and induced to endorse the note, was a fraud upon him, and vitiated the contract. Although the concealment had reference to facts and circumstances existing at the time the contract was made, the court were equally divided, and the judgment of the court below was, of course, affirmed.

But the question here is whether the laches of the officers of the government in disclosing the defalcations of the principal, or the continuance of the principal in office after the discovery of the unfaithfulness, releases the surety from liability on account of his subsequent misconduct. There are, it is true, several recent English cases, which give support to the contention and argument of the learned counsel of the defendants. Sanderson v. Aston, L. R. 8 Exch. 73; Burgess v. Eve, L. R. 13 Eq. 450; Phillips v. Foxall, L. R. 7 Q. B. 666. They are cases between private individuals, and in Phillips v. Foxall the court held, after full consideration, that "in a continuing guaranty for the honesty of a servant, if the master discovers that the servant has been guilty of dishonesty in the course of the service, and, instead of dismissing the servant, he chooses to continue him in his employ without the knowledge and consent of the surety, express or implied, he cannot afterward have recourse to the surety to make good any loss which may arise from his dishonesty during the subsequent service."

Many substantial reasons, doubtless, could be assigned why officials having the settlement of the accounts of public officers should be required to give prompt notice to sureties as soon as they discover any misappropriation or maladministration of the funds in their hands; but it has not been the law in this country in controversies upon official

bonds that a failure to give such notice, or the retention of the principal in office after knowledge of his defection, was fraudulent neglect which released the sureties. On the other hand, there are a number of cases which go to the full extent of holding the sureties liable, although the government, after knowledge of the defalcation, continued to trust the officer with the receipt and disbursement of the public moneys.

The case of Postmaster General v. Reeder [Case No. 11,311], was an early one in this circuit, and was a suit against the sureties in the official bond of the postmaster of the city of Trenton, involving, among other things, substantially the defence which I am now considering. Judge Washington carefully reviewed the question whether the omission of the postmaster general to notify the sureties of the deputy postmaster of his delinquencies was actually or constructively fraudulent, and in the course of his opinion says: "Upon the subject of fraudulent concealment from the defendant of defalcations of his principal, it cannot be pretended that negligence or breach of public duty, much less fraud, is imputable to the postmaster general; since he is not required, either by the law of the land or by the dictates of morality, to communicate those defects to the sureties. When they entered into his contract they trusted in the integrity and fidelity of their principal, and he was in all fairness bound at all times to satisfy their inquiries in relation to his official conduct. What might have been the legal consequence of a refusal by the postmaster general to afford information to the sureties upon this subject in case it had been asked for, or to institute suits against the postmaster for his defaults, if this had been demanded, need not be decided in this case; since there is no evidence tending to prove that such request or demand had ever been made by the defendant or by his co-surety."

The supreme court in U. S. v. Kirkpatrick, 9 Wheat. [22 U. S.] 720, in U. S. v. Van Zandt, 11 Wheat. [24 U. S.] 184, and in Dox v. Postmaster General, 1 Pet. [26 U. S.] 318, have reached conclusions which render this defence untenable here. (The cases are sketched and a synopsis of the opinions given, after which Judge NIXON continues, referring to the last case:) Chief Justice Marshall, who delivered the opinion of the court, did not hesitate to say that they exhibited a gross neglect of duty on the part of the postmaster general. After reviewing the cases of U. S. v. Kirkpatrick and U. S. v. Van Zandt, he says: "These two cases seem to fix the principle that the laches of the officers of the government, however gross, do not of themselves discharge the sureties in an official bond from the obligation it creates, as firmly as the decisions of this court can fix it."

3. The third ground assigned is that the possession of the office by the special agent of the department for one day, while adjusting the accounts in the year 1872, when the arrears were paid, released the sureties from all subsequent liability under the provisions of section 3836 of the Revised Statutes. The answer to this suggestion is that the section applies only to cases where the office is vacant, and was not intended to have any application where, as under the present circumstances, the postmaster still remains in office.

4. There seems to be no foundation in fact for the last ground assigned, to wit, that the suit is barred by the statute of limitations. The default occurred in February, 1873, and the suit was brought in the following September.